UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

KYLE ALLEN BOLTON,

Plaintiff,

v.                                        CAUSE NO. 1:22-CV-228-HAB-SJF

GENERAL MOTORS,

Defendant.

OPINION AND ORDER

Kyle Allen Bolton, a prisoner without a lawyer, proceeds in this case on five

claims against Defendant General Motors. Specifically, the court granted him leave to

proceed against General Motors on the following claims:

(1) A claim under Title VII of the Civil Rights Act of 1964 (Title VII)
against General Motors, for demoting him to an inferior position in April
2021 because of his race or skin color;

(2) A claim under Title VII for firing him in May 2021 in retaliation for
filing a charge of discrimination with the Equal Employment Opportunity
Commission (EEOC);

(3) A State law claim of defamation for stating that he is racist in an email
to employees of General Motors, Stratosphere, and Hoosier Personnel
Staffing;

(4) A State law claim for intentional infliction of emotional distress based
on the allegedly defamatory email and the resulting actions in or around
May 2021;

(5) A State law claim for tortious interference with a contract or business
relationship for firing him in May 2021, causing Stratosphere to breach a
contract promising Bolton full-time employment and/or impairing the
business relationship between Bolton and Stratosphere.

ECF 219. On May 22, 2025, Bolton filed a motion for summary judgment on all claims. ECF 234. On October 17, 2025, the defendant also filed a motion for summary judgment on all claims. ECF 276. These motions remain pending and are now ripe for review.

FACTS

In February 2021, Hoosier Personnel Staffing ("Hoosier") hired Bolton as a temporary associate. ECF 162-1 at 18-24. On or around February 28, 2021, Hoosier placed Bolton with Stratosphere Quality, LLC, ("Stratosphere").[1] *Id.* at 24. Stratosphere had a contract with General Motors to conduct COVID-19 screenings during shift changes ("gate duty") and to inspect the vehicles manufactured at the facility at various outdoor lots ("yard duty"). ECF 239-1 at 13-16. Stratosphere placed Bolton with General Motors in Fort Wayne, Indiana, where he was assigned to yard duty. *Id.* at 13.

In March 2021, Bolton moved to gate duty at the General Motors assembly plant. *Id.* at 16-17. Human resources from General Motors received a report from a union representative that, on April 29, 2021, a General Motors employee greeted Bolton, and Bolton responded, "I am sorry. I do not talk to black people." ECF 277-3 at 1. On April 30, 2021, General Motors conveyed the accusation to Stratosphere via telephone and asked for Bolton's removal from the position. *Id.* at 2; ECF 160-1 at 23. Stratosphere decided to terminate Bolton. *Id.* When a Hoosier manager called Bolton, Bolton responded that he was black and denied making the offensive statement. *Id.* at 5-9. The

---

[1] Both Hoosier and Stratosphere were defendants in this case, but the court dismissed them pursuant to a joint stipulation on October 29, 2025. ECF 288.

Hoosier manager suggested a case of mistaken identity and asked Stratosphere to follow up with General Motors. *Id.*

On the morning of May 3, 2021, Bolton filed a charge of discrimination with the Equal Employment Opportunity Commission, stating as follows:

> On or about April 30, 2021, I received notification that I was being terminated for allegedly making a racial remark about black people. However, I did not make any comments based on race. In addition, I believe I was accused of making the comment because it was assumed that I am white because I have a lighter skin color.

ECF 264-6. On the same morning, General Motors told Stratosphere that Bolton could work at the assembly plant but not inside the assembly plant. ECF 160-1 at 5-9. Stratosphere rescinded its termination of Bolton and reassigned him to yard duty. ECF 239-1 at 21. Bolton perceived this reassignment as an adverse action because this position was more laborious, and he received fewer hours. *Id.* at 24-25.

On May 5, 2021, the EEOC notified General Motors that Bolton had filed a charge of discrimination against it. ECF 244-2 at 30-31. Further, Bolton testified that he had disclosed his filing of the charge of discrimination as follows:

> **Defense Counsel:** Did you ever tell Stratosphere or tell anyone at Stratosphere that you had filed a charge of discrimination while you were still employed.
>
> **Bolton:** Yes.
>
> **Defense Counsel:** Who did you tell?
>
> **Bolton:** Everybody. Cody Harris. I told Sarah. My girlfriend knows. When we were walking around that night working on the trucks, right, this is at night, there's other people with me like Cedric, for instance. And I'm like, Cedric also works at gate duty with me and he's . . . I guess it's been disputed if I'm black or not.  Cedric's undebatably black, his skin color,

3

everything. We were talking. I'm like, can you believe they're doing this? And this is crazy. Yeah, I can't believe that. I'm like, yeah, I filed an EEOC charge. Everyone knew about the EEOC charge there. You even see them discussing it in the emails that I went to the EEOC.

ECF 239-2 at 5-6

On or around May 25, 2021, Bolton called human resources at General Motors, which he described at his deposition as follows:

**Defense Counsel:** It is true that you called GM HR repeatedly to express your . . . anger related to that situation, correct?

**Bolton:** I called to speak about how outrageous this was and return to gate duty. So I assumed that the call was recorded. GM staff were very obnoxious. And the final thing that was said was, who I believe is the James Bailey[2] guy, was, "[S]o you went to the EEOC. Well, I can do nothing for you then." And he hung up the phone. So, yes, I called back. And then they hung up again. And I called back. And then they hung up again. And I call back. And they hang up again. There's no words going on when I'm calling. I'm calling back to discuss how crazy this is. And GM HR is hanging up. That's their fault. That's not my fault.

**Defense Counsel:** So the first phone call that you had with someone in GM HR, you were upset during that call. Is that accurate?

**Bolton:** I was upset the entire time, before the phone call, after. I'm upset now.

**Defense Counsel:** Would you say that when you had that phone call, the one where you actually spoke with someone at GM, or one of the ones, that you were raising your voice or you were speaking in kind of a heated, upset sort of tone?

**Bolton:** There was only one phone call with dialogue. And the answer is yes, we all were, which is why I wanted to the phone call to be heard in court. So you could see that, even though it is heated, there's not cuss words, none of that.

---

[2] Though immaterial to resolving the summary judgment motions, it is unclear why Bolton has identified this individual as James Bailey.

4

**Defense Counsel:** Okay.

**Bolton:** It got strictly terminated off of the EEOC complaint. That's it.

**Defense Counsel:** Would it be accurate to say that you were yelling during that call or at least raising your voice?

**Bolton:** Raising voice, yes, after a voice was raised on me first, ironically, by a woman who you guys probably can't identify because for some reason they didn't keep a record. But I remember the first thing she said was, I'm not the one who handled your case. Like, I'm wrong for calling to talk about this. They already knew what was going on. Okay? And she said one other thing. She said, we take allegations of discrimination very seriously. And I'm saying this is discrimination. That's when James Bailey gets on the phone – or I can't say for sure that's James Bailey. But it says he's the head of GM HR. And the guy on the phone says he's the head of GM HR, so . . .

**Defense Counsel:** And I want to make sure that I understand this too, Mr. Bolton. The purpose of that phone call that you initially made to GM HR was to, I believe you said, talk about the fact that you were upset about being moved off of gate duty, that was one of the reasons. Is that right?

**Bolton:** To talk about the fact that I'm an African-American who has proved that I'm African-American. And I have an African-American girlfriend working on the same compound who lives at home with me. And I'm being denied gate duty, and not just moved from gate duty, but I can't even do part-time gate duty like everyone else is doing over an allegation that I don't speak to one black person because they're black out of hundreds on the compound.

**Defense Counsel:** Okay.

**Bolton:** There's no sense to it. And for purposes of proving something wrong, you can revert to the wackiness of the claim in light of what's evident in reality. What do I have to do to prove that I speak to black people? What's going on? There's no logic to it. This is what the discussion is.

**Defense Counsel:** Okay.

**Bolton:** Nobody thinks that this was a reasonable action by GM. It's not in the same category of being accused of sorcery, but it's very close. So that's what the discussion was about.

**Defense Counsel:** Just to kind of summarize what we just talked about the last few minutes: there was one substantive phone call where you actually had a dialogue with individuals in GM HR. That particular discussion got heated and agitated, correct?

**Bolton:** Correct.

**Defense Counsel:** Okay. I believe the HR representative ultimately ended the call and hung up the phone, correct?

**Bolton:** Due to the EEOC complaint, yes. He felt like he could do it. I don't know how well he reviewed how things are supposed to go with the EEOC complaint. But he took the EEOC complaint as a threat and terminated the call.

**Defense Counsel:** So did you mention to him that you had gone to the EEOC? Did you bring that up to him during the call?

**Bolton:** Yes, because we're talking about something preposterous. In a conversation, if my point is ridiculous and you're confronting me with facts, at some point, as a civilized human being, I'm supposed to be like, you know what, this is ridiculous, you're right. So we're not getting to that. So the next level of mediation is the EEOC. So I established I went to the EEOC.

**Defense Counsel:** Okay.

**Bolton:** You went to the EEOC? Well, I can do nothing for you then. And he hung up. That is retaliation de facto.

* * *

**Defense Counsel:** And it was after that point that you attempted to call back multiple times?

**Bolton:** Several times.  Several times.

* * *

**Defense Counsel:** So next question. It was after this sort of heated conversation with HR and the series of phone calls that you attempted to make, it was after that point that your assignment with GM and with Stratosphere ultimately ended. Is that correct?

**Bolton:** Remember the substance. The EEOC complaint terminated the phone call. Immediately after that phone call dispute, within the next 12 hours, probably six, I was notified that the assignment is over for me. I cannot come back. So immediately.

ECF 239-1 at 29-36.[3]

In his reply in support of his motion for summary judgment, Bolton described

the telephone call as follows:

It is not disputed that I called GM HR to discuss the discrimination and blatant defamatory lie that was proliferated against me. Calling a company multiple times in a day (8 times) is not alarming or grounds to be "disturbed". I called 8 times because the man hung up on me for going to the EEOC and contrary to the perjurious lies GM put in its defense exhibits, they never picked up the phone again. No more words were ever exchanged. Yes, "angry is a vast understatement." I will say that again "I was livid." But that does not mean I yelled, berated, or threatened them unless you consider telling them that they are wrong and discriminating against me as beratement, consider stern speech yelling, and consider an EEOC complaint as a threat.

ECF 275 at 36-37.

Two human resources representatives from General Motors described the

interaction with Bolton as follows:

**M.F.:** At some point [after Bolton's reassignment], Bolton called the plant, and his call was patched through to HR/LR and I fielded his call. Bolton immediately start[ed] yelling at me. He repeatedly yelled about being accused of being "racist" when he is "albino black." I tried to calm him down and explained to him that I was not his HR partner, and that he needed to call Stratosphere instead. He continued to yell at me and berate me. I eventually hung up on him due to the yelling and disturbing

---

[3] The court has lightly edited this portion of the transcript for purposes of clarity.

behavior. Bolton continued to call plant security for the next several hours. Security put some of his calls through to HR/LR, and I handled two of those additional calls. I again attempted to calm him down, but I could not get a word in over his yelling.

**A.R.:** Approximately one month [after Bolton's reassignment], Bolton called plant security, which transferred his call to the HR/LR department. HR/LR Partner M.F. took Bolton's call, and Bolton became irate with M.F. Bolton repeatedly yelled at, badgered, and spoke in a threatening manner toward M.F., to the point that M.F. hung up on him. Bolton continued to call multiple times, and I fielded some of his subsequent calls. He continued to yell in a threatening manner, and I repeatedly hung up on him. Ultimately I advised plant security to stop putting his calls through to HR/LR. Following this incident, HR/LR advised Stratosphere that due to Bolton's increasingly concerning behavior as demonstrated by his multiple irate threatening phone calls to HR/LR, he would no longer be allowed on GM property. I was involved in these discussions.

ECF 277-3; ECF 277-4.

On the same day, a scheduler from Stratosphere emailed a Hoosiers manager as follows:

Kyle Bolton is being ended effective immediately. I am not sure 100% of the details. I know he has been calling GM and threatening them but this is all I know. . . . If he arrives tonight at GM, he will be sent home with no show up pay. Please let him know his assignment has been ended effective immediately.

ECF 160-1 at 25. On October 8, 2021, Bolton posted a YouTube video of a recording in which he complains about the accusation to a Stratosphere employee while at work and describes himself as "albino" and "African-American."[4] He also described himself to General Motors in similar terms. ECF 275 at 37.

---

[4] This video is available at https://youtu.be/fi7stLKiyCk?si=xAb0SsKhfjlROxzO, and the court found this link within Stratosphere's production of documents at ECF 203-3.

STANDARD OF REVIEW

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010).

DISCUSSION

Discrimination on the Basis of Race or Color

Bolton asserts a claim under Title VII against General Motors for demoting him to an inferior position in April 2021 because of his race or skin color. While Bolton's arguments are somewhat difficult to follow, it appears his theory for his removal from gate duty is as follows:

> It is because GM had an ulterior motive beyond simple altruism and fundamental fairness. Their motive was to attempt to appease 2 separate African-Americans – one unidentified yet assumed to be blacker, and the other identified yet assumed to be whiter – and they figured that I should get the short end of the stick and merely be happy that I didn't completely

9

lose my job while the other person should be happy because I got removed from my post. This foul sort of line of thinking is dangerous because it disregards the important of the actual truth behind the allegation and it is racist because the but-for cause was skin color and GM assumed it would be safer to side with the abstract person who they deemed blacker ethnically, culturally, and socially.

ECF 286 at 14.

"Our Circuit has now clarified the singular question that matters in a discrimination case: Whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . or other proscribed factor caused the discharge or other adverse employment action." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself. Relevant evidence must be considered and irrelevant evidence disregarded." *Id.* As explained by the Seventh Circuit:

One way of proving employment discrimination under Title VII remains the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). "The familiar *McDonnell Douglas* approach requires a plaintiff to make a prima facie case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext. To make a prima facie case under *McDonell Douglas*, a plaintiff must show: (1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer.

*Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957–58 (7th Cir. 2021).

For comparators, Bolton offers the complaining employee, his girlfriend who worked the same job as him, and the other black employees assigned to gate duty.

"Similarly situated employees must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). "In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 369 (7th Cir. 2019). "In a disparate discipline case, the similarly-situated inquiry often hinges on whether co-workers engaged in comparable rule or policy violations and received more lenient discipline." *Coleman v. Donahoe*, 667 F.3d 835, 850 (7th Cir. 2012).

The record contains no evidence that General Motors was aware of any accusation of misconduct against the proposed comparators or that it responded to such accusations with a more lenient form of discipline.[5] Further, the record does not suggest that the complaining employee had the same supervisor or was subject to the same standards as Bolton. To the contrary, the record suggests that the complaining employee was a union member and a direct employee of General Motors. Because Bolton has not identified a proper comparator, he has not made a prima facie case under the *McDonnell-Douglas* framework.

---

[5] Bolton might argue that the complaining employee's accusation against him was intentionally fabricated and that lodging an intentionally fabricated accusation amounts to misconduct. But there remains no evidence that Bolton had conveyed this concern to General Motors during his employment.

Nevertheless, the court will also consider General Motors' stated reason for the reassignment and whether Bolton has shown that it was pretext. General Motors explains that it reassigned Bolton to gate duty based on the complaining employee's accusation that he had made a racially inappropriate remark. Bolton contends that crediting the accusation itself amounted to unlawful discrimination, arguing that General Motors would not have credited the complaining employee over his denial absent consideration of his skin color.

"A pretext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000). A plaintiff may establish pretext by providing either direct evidence indicating that the defendants were more likely than not motivated by a discriminatory reason, or indirect evidence showing that the defendants' stated reasons are not credible." *Alexander v. Wisconsin Dep't of Health & Fam. Servs.*, 263 F.3d 673, 682–83 (7th Cir. 2001). "Creating a triable pretext issue with indirect evidence is a difficult task which may be accomplished in one of two ways." *Id.* "[A plaintiff] must show either that the defendants lied about why they took the adverse action that they did or that the defendants' stated reasons for his suspensions and termination have no basis in fact." *Id.* "In determining whether the employer's reason can be characterized as pretextual, we do not evaluate whether the employer's proffered justification was accurate or even whether it was unfair." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir.

2020) "Our sole focus is on whether the employer's stated reason can be characterized as a falsehood rather than an honestly held belief." *Id.*

As an initial matter, the record does not identify the General Motors employee who issued the complaint, nor does it identify her skin color.[6] But even assuming that Bolton had a lighter skin color than the complaining employee, individuals of any race or skin color can make inappropriate discriminatory remarks to any other individuals of any race or skin color. *See e.g., Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 908 (7th Cir. 2018) ("On a final note, we reject entirely the defendant's notion that it strains credulity to think that African-American employees might be subject to a hostile work environment where many of the managers in the workplace are also African-Americans. There are many reasons why women and minorities in management might tolerate discrimination against members of their own class, or why they might participate in discriminatory acts themselves."); *Williams v. Wendler*, 530 F.3d 584, 587 (7th Cir. 2008) ("There can, it is true, be racial discrimination within the same race, broadly defined, because race is a fuzzy term."); *Smith v. P.A.M. Transp., Inc.*, 154 F.4th 375, 385 (6th Cir. 2025) ("Our circuit has recognized that Title VII can be violated by members of the same race or sex as the victim of discrimination."); *Billingsley v. Jefferson Cnty.*, 953 F.2d 1351, 1353 (11th Cir. 1992) ("Jefferson County in its appeal first contends

---

[6] As Bolton aptly notes, "We have no evidence in the record . . . that this complaint ever was made by a valid African American or black person. In fact, we don't even have evidence that a female employee made it versus this complaint being entirely made up by [the union representative.]" ECF 274 at 2-3.

that there is no cause of action under Title VII where both plaintiff and defendant are of same race and color. This contention is totally without merit.").

Further, other potential explanations in the record for crediting the accusation over Bolton's denial include the complaining employee's status as the initial accuser, a direct employee of General Motors, and a union member, and there are also potential non-discriminatory explanations on which the record is silent, including, for example, the employee's reputation within the assembly plant. Moreover, it is unclear whether General Motors even credited the accusation rather than merely acting prophylactically to separate the accuser from the accused. *See Paschall v. Tube Processing Corp.*, 28 F.4th 805, 813 (7th Cir. 2022) ("When a coworker is the harasser, however, the employer is liable only when the employee shows that her employer has been negligent either in discovering or remedying the harassment."). Consequently, no reasonable jury could find on this record that General Motors' stated reason was a pretext for unlawful discrimination based solely on General Motors' reaction to the accusation.

As evidence of pretext, Bolton also observes that, on November 22, 2021, General Motors filed in State court a "Petition of Employer for Injunction Prohibiting Violence or Threats of Violence Against Employee." This form petition included a section for a physical description of the defendant, which, in turn, prompts the petitioner to describe the defendant's race. ECF 161-1. There, General Motors wrote that, Bolton "identifies as African-American." ECF 275-2 at 9. Though Bolton perceives this description as an insult, no reasonable jury could conclude that this accurate and generally inoffensive phrase in response to a prompt on a form petition that was filed six months after his

termination suggests that General Motors had discriminatory intent when reassigning him.

Bolton next points to a document produced by Stratosphere during discovery in which he was described as "albino African-American whatever that means." ECF 160-1 at 10. However, there is nothing in this document attributing that description to General Motors. To the contrary, Stratosphere has represented that this document represents a text conversation between two Stratosphere employees on May 21, 2021. ECF 203 at 6. Even if it could be attributed to General Motors, the record demonstrates that Bolton had described himself as an "albino" and an "African-American" while at work and to General Motors. Setting generally known racial epithets aside, describing an individual's race in the same manner in which he or she describes it also does not suggest discriminatory intent.

Nor has Bolton pointed to any evidence suggesting that General Motors' stated reason had no basis in fact or lacked credibility. More specifically, while Bolton disputes that he uttered the racially inappropriate remark, there is no dispute that the union representative conveyed the accusation to General Motors. The record also lacks any suggestion that General Motors did not believe that the accusation was credible or that it was sufficiently serious as to warrant reassignment.

"But a plaintiff need not use the *McDonell Douglas* framework after *Ortiz*." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (referring to *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016)). "There is no magic to [the *McDonnell Douglas* framework]; it is merely one way of culling the relevant evidence

15

needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's race or other proscribed factor." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). "Under *Ortiz*, we therefore ask whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki*, 988 F.3d at 958. The *Ortiz* approach has been described as "holistic" and "straightforward" when compared to the *McDonnell-Douglas* framework. *Reives v. Illinois State Police*, 29 F.4th 887, 893 (7th Cir. 2022); *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 369 (7th Cir. 2019).

Bolton fares no better under the *Ortiz* approach given that the relevant evidence remains the same. As detailed above, he has not identified any proper comparator or any statement from General Motors suggesting discriminatory intent, and there is nothing inherently suspicious about General Motors separating Bolton from the complaining employee. Further, there is no evidence that General Motors' stated reason for reassignment was a pretextual falsehood. In sum, the record contains no evidence to suggest that race or skin color played any role in General Motors' decision to remove Bolton from gate duty. Therefore, the court grants summary judgment in favor of General Motors on the claim of race and color discrimination.

<u>Retaliation</u>

Bolton asserts a Title VII claim against General Motors for firing him in May 2021 in retaliation for filing a charge of discrimination with the EEOC. "To succeed on a retaliation claim, a plaintiff can take a direct approach and show that (1) he engaged in protected activity; (2) he suffered a materially adverse employment action; and (3) there

was a causal link between the protected activity and the adverse action." *Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 472 (7th Cir. 2018). "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360  (2013).

"Alternatively, a plaintiff may take an indirect approach, by which he must show that (1) he engaged in protected activity; (2) he suffered a materially adverse employment action; (3) he was meeting his employer's legitimate expectations; and (4) he was treated less favorably than similarly-situated employees who did not engage in protected activity." *Id.* "If the plaintiff makes that showing, the burden shifts to the employer to articulate some legitimate, nonretaliatory reason for its action, which it is then up to the plaintiff to expose as pretext." *Id.* Bolton identifies no similarly situated employee who did not engage in protected activity but was treated more favorably, (*i.e.*, an employee who called human resources, engaged in a heated and agitated discussion in an effort to discredit the accusation of a coworker, attempted to call back eight times once human resources terminated the call, or otherwise engaged in misconduct of similar severity). Consequently, the court will focus on the direct approach.

General Motors argues that the undisputed evidence demonstrates that the but-for cause for Bolton's termination on May 25, 2021, was the series of aggressive telephone calls, while Bolton points to the comment about Bolton going to the EEOC, the immediate termination of the telephone call, and the termination of his employment

just hours later. "[S]uspicious timing will rarely be sufficient in and of itself to create a triable issue." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). "For a suspicious-timing argument alone to give rise to an inference of causation, the plaintiff must demonstrate that an adverse employment action follows close on the heels of protected expression, and the plaintiff must show that the person who decided to impose the adverse action knew of the protected conduct." *Id.* "There can be no set legal rule for determining whether an adverse employment action falls close on the heels of protected activity because such a determination depends on context." *Id.* "[A]n employee's complaint does not immunize him from being subsequently disciplined or terminated for inappropriate workplace behavior." *Id.* "Thus, where a significant intervening event separates an employee's protected activity from the adverse employment action he receives, a suspicious-timing argument will not prevail." *Id.*

On April 30, 2021, General Motors had asked Stratosphere to stop scheduling Bolton at their properties but ultimately opted for a lesser course of action; nevertheless, this near decision demonstrates that General Motors perceived the accusation alone as a circumstance warranting termination and had, in fact, stood on the precipice of terminating Bolton even before he had filed a charge of discrimination. On May 5, 2021, the EEOC notified General Motors that Bolton had filed a charge of discrimination against them. Bolton also told "everybody" at his work location that he had filed a charge of discrimination.

Two weeks later, Bolton engaged in a hostile conversation with human resource representatives from General Motors. The parties' dispute largely appears to center

around the choice of words rather than the degree of hostility itself. According to Bolton, the purpose of the call was to discredit the allegation of the complaining employee. During the call, he was "upset," "angry," and "livid" and had raised his voice, and the conversation was "heated" and "agitated." The call was escalated to a higher-level representative and then ended by that representative with the final exchange pertaining to Bolton seeking assistance from the EEOC.

Notwithstanding the apparent lack of interest by human resources in continuing the telephone call and the futility of Bolton's persuasive efforts, Bolton proceeded to call back eight times, which prompted the human resources representative to tell security staff to stop forwarding his calls. Calling a human resources department eight times in quick succession immediately after that department has ended an argumentative call could, by itself, be fairly seen as badgering or threatening behavior warranting termination. This would be true regardless of the specific nature of the concern conveyed by the worker, and there is no indication that General Motors did not genuinely perceive this conduct as threatening or that General Motors had tolerated this type of conduct from other workers.

In sum, General Motors had very nearly terminated Bolton just three weeks earlier on April 30, 2021. General Motors received notice of the charge of discrimination on May 5, 2021, and Bolton spoke about it freely while at work. However, General Motors did not terminate Bolton or take any other adverse action toward him until this hostile interaction occurred on May 21, 2021; General Motors then terminated Bolton within hours. Given this timeline, it is readily apparent that the hostile interaction was

the impetus for terminating Bolton and that, on this record, no reasonable jury could find that General Motors terminated Bolton because he had filed the charge of discrimination. Therefore, the court grants summary judgment in favor of General Motors on the claim of retaliation.

State Law Claims

Having resolved the pending federal claims, the court pauses to assess whether it should relinquish jurisdiction over the remaining State law claims or whether it should address their merits. "When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims, which the plaintiff can then prosecute in state court." *Al's Serv. Ctr. v. BP Prod. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010). "There are, however, unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness and comity— will point to federal decision of the state-law claims on the merits." *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994).

"There are three acknowledged exceptions to this rule: when (1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514–15 (7th Cir. 2009). Here, the court committed substantial judicial resources to this case in preparing the screening orders, reviewing the

20

discovery, the lengthy summary judgment briefs, and other filings, and also assisting Bolton and two of the defendants with reaching a settlement agreement, including on State law claims. Given this substantial commitment of judicial resources, the court will address the merits of the State law claims.

Defamation

Bolton asserted a State law claim of defamation against General Motors for stating that he is racist in an email to employees of General Motors, Stratosphere, and Hoosier. General Motors asserts the defense of truth and qualified privilege. Under Indiana law, to prevail on a claim of defamation, "the plaintiff must demonstrate (1) a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages." *Kelley v. Tanoos*, 865 N.E.2d 593, 597 (Ind. 2007).

To start, the court observes that the record does not support the specific allegations on which Bolton was allowed to proceed. There is no indication that any General Motors employee ever referred to Bolton as a racist via email or otherwise. More charitably construed, the focus of this claim is on when General Motors notified Stratosphere of the accusation. While the record indicates that such a notification occurred, the specific contents of this notification are not contained within the record. Similarly, the record contains no detail as to the specific circumstances of how General Motors learned of and decided to convey the accusation. Though Bolton vehemently denies the accusation, this bare denial is not sufficient for a reasonable jury to find that General Motors conveyed the accusation to Stratosphere with malice. Therefore, the

court grants summary judgment in favor of General Motors on the State law claim of defamation.

Here, the court further addresses Bolton's argument that he is entitled to summary judgment on a State law claim of false light. False light is a separate tort from defamation. *Branham v. Celadon Trucking Servs., Inc.*, 744 N.E.2d 514, 524 (Ind. Ct. App. 2001) ("Branham also asserts a claim for false light publicity. This tort is similar to defamation, but reaches different interests."). The court did not grant Bolton leave to proceed on a State law claim of false light, so he is not entitled to summary judgment on such a claim. Moreover, even if Bolton had leave, he could not have prevailed on such a claim because the record indicates that General Motors conveyed the accusation to only a single Stratosphere employee. *See Frobose v. Am. Sav. & Loan Ass'n of Danville*, 152 F.3d 602, 617–18 (7th Cir. 1998) ("[T]he heart of this tort lies in the publicity. . . a matter is made public by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.").

### Intentional Infliction of Emotional Distress

Bolton asserts a State law claim for intentional infliction of emotional distress against General Motors based on the allegedly defamatory email and the resulting actions in or around May 2021. Here, again, the court observes that the record contains no emails sent by General Motors, but the court broadly construes this claim as encompassing the actions of General Motors towards Bolton in April and May 2021.

"In order to establish a claim of intentional infliction of emotional distress, a plaintiff must prove that the defendant: (1) engages in extreme and outrageous conduct

(2) which intentionally or recklessly (3) causes (4) severe emotional distress to another."

*Haegert v. McMullan*, 953 N.E.2d 1223, 1235 (Ind. Ct. App. 2011). "It is the intent to harm the plaintiff emotionally that constitutes the basis of the tort, and the requirement to prove the elements of the tort are rigorous." *Id.* "Intentional infliction of emotional distress is established in cases where the conduct exceeds all bounds typically tolerated by a decent society and causes mental distress of a very serious kind." *Id.*

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Bradley v. Hall*, 720 N.E.2d 747, 752–53 (Ind. Ct. App. 1999) (quoting RESTATEMENT (SECOND) OF TORTS § 46).

The Seventh Circuit has recognized that "Indiana courts have been reluctant to award damages for intentional infliction of emotional distress in employment cases." *Cortezano v. Salin Bank & Tr. Co.*, 680 F.3d 936, 941 (7th Cir. 2012) (quoting *McCreary v. Libbey–Owens–Ford Co.*, 132 F.3d 1159, 1167 (7th Cir. 1998)). Nevertheless, the Indiana Court of Appeals has upheld a jury verdict for intentional infliction of emotional distress in a case where one partner "called [another partner] vile names, belittled her,

threatened her and her secretary, and ended up kicking her in the stomach." *Landis v. Landis*, 664 N.E.2d 754, 755 (Ind. Ct. App. 1996).

Against this backdrop, the court cannot find that the record contains sufficient evidence that General Motors engaged in extreme and outrageous conduct. As detailed above, the record contains no evidence suggesting that General Motors acted with unlawful discriminatory or retaliatory intent. To the contrary, the record reflects that General Motors reassigned Bolton to another position because an employee had accused him of making an inappropriate remark and terminated him due to a hostile interaction with Bolton that they perceived as threatening. It remains possible that General Motors may have acted on inaccurate information or overreacted in response to a hostile interaction, but such conduct is neither extreme nor outrageous as defined by Indiana law. Indeed, it is not even clear that Bolton could prevail on a claim of intentional infliction of emotional distress even if General Motors had violated Title VII as Bolton suggests given that even tortious and criminal behavior is not necessarily extreme or outrageous conduct under Indiana law. *See also Walton v. U.S. Steel Corp.*, 2012 WL 6681725, at *11 (N.D. Ind. Dec. 21, 2012) ("Generally, disciplining and terminating an employee is not severe enough to meet the standard to show extreme and outrageous conduct . . . . A termination that was done matter-of-factly will not satisfy this standard."). Therefore, the court grants summary judgment in favor of General Motors on the claim of intentional infliction of emotional distress.

<u>Tortious Interference with Business Contract or Relations</u>

Bolton asserts a State law claim for tortious interference with a contract or business relationship against General Motors for firing him in May 2021. According to Bolton, General Motors caused Stratosphere to breach a contract promising Bolton full-time employment after he had been placed there for a certain length of time and impaired the business relationship between Bolton and Stratosphere. "The elements of tortious interference with a business relationship are: (1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship." *McCollough v. Noblesville Schs.*, 63 N.E.3d 334, 344 (Ind. Ct. App. 2016) "[T]his tort requires some independent illegal action." *Id.* "The elements of an action for tortious interference with a contract are the same as the elements for interference with a business relationship except that there is a requirement for a valid and enforceable contract." *Id.* "[Absence of justification] is established only if the interferer acted intentionally, without a legitimate business purpose, and the breach is malicious and exclusively directed to the injury and damage of another. The existence of a legitimate reason for the defendant's actions provides the necessary justification to avoid liability." *Melton v. Ousley*, 925 N.E.2d 430, 441 (Ind. Ct. App. 2010).

The record contains insufficient evidence of a valid contract between Bolton and Stratosphere. Though Bolton characterizes his understanding of eventual employment with Stratosphere as a verbal agreement, he offers no description of specific interactions

with Stratosphere that would allow for a reasonable inference that a contract had been formed or for a meaningful assessment of the contractual terms. *See e.g., Indiana Bureau of Motor Vehicles v. Ash, Inc.*, 895 N.E.2d 359, 365 (Ind. Ct. App. 2008) ("An offer, acceptance, consideration, and a manifestation of mutual assent establish the existence of a contract."); *Zollman v. Geneva Leasing Assocs., Inc.*, 780 N.E.2d 387, 392 (Ind. Ct. App. 2002) ("[For purposes of contract interpretation,] [w]e ascertain the intent of the parties at the time the contract was entered by examining the words used in the agreement to express the parties' respective rights and duties."); *Indiana-Am. Water Co. v. Town of Seelyville*, 698 N.E.2d 1255, 1260 (Ind. Ct. App. 1998) ("As expressed under Indiana law: it is fundamental that a contract is unenforceable if it fails to obligate the parties to do anything.").

Further, as detailed above, General Motors had ample justification for terminating Bolton and conveying that decision to Stratosphere. Moreover, Bolton identifies no independent illegal actions other than those addressed by the court above. Therefore, the court grants summary judgment in favor of General Motors on the tortious interference with business contract or relations claim.

## Other Pending Motions

Bolton filed a motion for sanctions against General Motors for inconsistencies within its summary judgment briefs and for "losing" the identity of the complaining employee. ECF 274. He notes that General Motors made the following statements in the response brief opposing Bolton's motion for summary judgment:

- To the extent Plaintiff attempts to characterize the purportedly darker-skinned black employee who complained about him as a comparator, the identity of this employee has never been confirmed so as to discern the color of her skin or her job title, job duties, or supervisor.

- Rather, as discussed herein, it is undisputed that an African American female GM employee complained to her UAW Local 2209 Zone Committeeman that Plaintiff made a race-based comment, specifically, that he does not talk to black people.

ECF 268 at 12, 20. While these statements might appear to be inconsistent at first glance, a careful reading shows that they are consistent. The record reflects that the union representative conveyed specific facts about the complaining employee, including her race, gender, employment status, and the contents of her accusation. However, there is no indication that the union representative provided any other details, and General Motors has been unable to identify the complaining employee throughout discovery, so any other details about this employee remain unknown. These consistent statements do not warrant sanctions.

Further, it is unclear how General Motors' inability to identify the complaining employee amounts to sanctionable conduct. There is no indication that General Motors is concealing evidence, failed to conduct a reasonable investigation during discovery, or that it failed to comply with a duty to preserve evidence. The mere fact that General Motors does not have any additional information about the complaining employee does not warrant sanctions. Therefore, the motion for sanctions is denied.

Bolton also filed a motion purporting to seek oral arguments on the summary judgment motions, but it appears to be an elaboration of his summary judgment

arguments. ECF 295. The court has considered these arguments but finds none of them persuasive with respect to summary judgment or holding oral arguments. Therefore, the motion for oral arguments is denied.

* * *

In conclusion, the court grants the motion for summary judgment filed by General Motors on all claims and denies the motion for summary judgment filed by Bolton. Because no claims remain, the court will also direct the clerk to enter judgment in favor of General Motors and to close this case.

For these reasons, the court:

(1) DENIES the motion for sanctions (ECF 274);

(2) DENIES the motion for oral arguments (ECF 295);

(3) DENIES the plaintiff's motion for summary judgment  (ECF 234);

(4) GRANTS the defendant's motion for summary judgment (ECF 276); and

(5) DIRECTS the clerk to enter judgment in favor of the defendant and to close this case.

SO ORDERED on January 30, 2026.

s/ Holly A. Brady
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT